Filed 6/23/15  Li v. Trendwest Resorts CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VICTORIA LI,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>TRENDWEST RESORTS, INC., et al.,<br><br>      Defendants and Appellants. | A130971, A131468<br><br>(Contra Costa County<br>Super. Ct. No. MSC05-01991) |

Victoria Li (Li), former employee of Trendwest Resorts, Inc., Cendant Timeshare Resort Group, and Wyndham Worldwide Corporation (together, Trendwest)[1], appeals from a judgment entered after a jury trial in her employment action against Trendwest. She contends the judgment must be reversed because:  (1) the jury's verdict was inconsistent; (2) the jury's award on her Intentional Infliction of Emotional Distress (IIED) claim was inadequate and was the result of "a compromise on liability"; (3) the trial court erred in its evidentiary and instructional rulings related to her retaliation claim under the California Family Right Act (CFRA); (4) the trial court erred in granting Trendwest's motion for summary adjudication of her harassment claim; and (5) the trial court erred in denying her request for attorney fees.

---

[1]Li brought this action against three corporate defendants—Trendwest Resorts, Inc., Cendant Timeshare Resort Group, and Wyndham Worldwide Corporation.  For ease of reference, and as done in the proceedings below, we shall refer to the defendants collectively as Trendwest.

1

Trendwest cross-appeals and contends: (1) there was no substantial evidence to support the jury's verdict on Li's IIED claim; (2) the IIED claim was barred by workers' compensation exclusivity; and (3) the jury improperly awarded punitive damages to Li. We reject both parties' contentions and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

In May 1995, Li began working as a sales representative in the Vallejo office of Trendwest, which sells vacation timeshares. A project director led each Trendwest office, assisted by a sales manager and an assistant manager. Sales representatives served below each store management team. Li worked in Vallejo for approximately six months before being terminated for low sales. She returned to Trendwest in January 1996 as a sales representative in the San Jose office.

After approximately one month in San Jose, Li transferred to the Sacramento office and continued to work there for two years. In Sacramento, she found traction in her sales and received multiple awards. She was the salesperson of the month many times, typically six out of 12 months each year, which meant she had the "highest number, highest volume for the month in sales [] in the store." She was also salesperson of the year. She was selected as the "overflow presenter," who was in charge of presenting a product to a group when there were too many clients to present it "one-on one." Li had the ability to remember the names of most of the 50 people in the room and could "go around the room and talk to them and call them by name."

In 1998, Li transferred to Trendwest's Burlingame office. In her 1998 performance review, Li aspired to join management. She aimed to be an assistant manager within one to two years and a sales manager within three to five years. She excelled in Burlingame and achieved "President's Club status" in 1999, a sales distinction awarded to sales representatives who achieve 100 sales in a year, or, in 1999, $1.2 million in sales. She was also the salesperson of the year in 1999. Li continued to do overflow presentations and also became an effective "podium present[er]," whose role it was to introduce everyone who attended presentations for a particular time period to the company. In or around April 2001, Li was promoted to assistant manager. Burlingame's

2

project director, Steven Level, was supportive of Li's progression to management and said she was "one of the strongest managers and salespeople [he had] ever worked with." Richard Hicks, who worked with Li in Burlingame, believed that Li's organization, product knowledge and her ability to relate to people made her a highly qualified manager and project manager.

In or around May 2003, Trendwest moved its Burlingame office to San Francisco's Fisherman's Wharf. Level became the project director of Fisherman's Wharf. Li became co-sales manager at Fisherman's Wharf, along with Boris Cood, who went out on medical leave shortly after being assigned to the position. While Cood was on medical leave, a new manager asked Carter Lee, director of sales for Northern California, where to place Cood's belongings. Lee replied, "just throw it in a box because he's not coming back." Lee later told employees at a June 2004 meeting at Trendwest's Walnut Creek office that "anybody who went out on disability leave would be fired" or "would not be promoted." Lee said he was "not going to stop until [he] hunt[ed] everyone down and [got] rid of them."

Regional Vice President for Northern California, Kevin Fiore, said he should "micromanage" any employees who returned from medical leave, "drive them crazy, [and] push them out of the company." He felt that people who take medical leave "cheat and steal," are "a burden on the company," and are "faking it" so that they could take time off. In an email to a Trendwest employee, Fiore wrote that he was "disappointed that we have so many people from our region that use [medical leave] as a means of taking days off." In another email, Fiore wrote: " 'Unfortunately, we continue to be hampered by numerous short-term disability claims and Workers' Compensation claims that have left many of our offices shorthanded. Our plan is simple. It is to keep everything based on performance and results. We will reward good performance and results, and the real champions are going to rise up to take part. The whiners and complainers and people with entitlement mentalities will go away.' "

In September 2003, Li became the sole sales manager when Cood was terminated while on medical leave. Li received an overall rating of "star performer" in her 2003

3

performance review, which meant she "consistently exceed[ed] position," her "standards and responsibility [were] commendable," her "achievements [were] beyond those reasonably expected," and she "exhibit[ed] exceptional leadership qualities and contribute[d] to the team effort." She was also rated a "star performer" in the categories of "appropriate presentation," "attitude," "attendance," and "policy awareness." She worked hard and was "the first one in" and "the last one out" of the office. She "put [her] heart and soul" into Trendwest.

Although Li continued to perform well, Fisherman's Wharf as a whole was not successful, ranking among Trendwest's lowest performing stores. Fisherman's Wharf was unique because it was in an inconvenient location with expensive parking. A "do not call list" had also been implemented, making it difficult to reach people by telephone. Trendwest therefore changed its business model for Fisherman's Wharf and implemented an "outside public contacts" (OPC) approach whereby employees stood in booths or street corners and asked people to attend timeshare presentations. The OPC approach was a "much harder sale" because it was "very, very" "invasive" and because many clients came unprepared and were not able to make a down payment. Fisherman's Wharf had "sales and marketing problems" and employed a "faulty strategy," and sales representatives at other offices referred to it as Siberia, refusing to go there because of its reputation as being unsuccessful. There was also a high turnover rate at Fisherman's Wharf.

In late 2003, project director Level was transferred to Novato to become the project director in that office. After Level left, Rhea Forte became the project director for Fisherman's Wharf. When Forte went on medical leave, Bijan Mirzadegan took over as interim project director. At that time, Li emailed Fiore, stating that if Fiore was "not keeping Bijan Mirzadegan in that position," she felt she was "the next most qualified person for [the] position." She explained she had been the sales manager at Fisherman's Wharf, had a working knowledge of the dynamics of the store, and had the "trust and rapport of the sales personnel as well as the administrative staff to direct the project and

4

make it successful."  Fiore told Li they could "meet and talk about it when he came into the office."

By the time Fiore came to Li's office to discuss the issue with her, the decision had already been made to place Bobby Bishop in the project director position.[2]  When it was announced that Bishop was going to take over as project director, Li told Fiore that he should have given her the opportunity and that her numbers were higher than Bishop's.  Fiore responded, "[y]ou know Bobby Bishop's better.  Do you want to compare resumes?"  Li reminded Fiore that she had been at Trendwest for nine years whereas Bishop had left Trendwest and was returning from another company.  Fiore responded that an employee's longevity was "not indicative of someone's knowledge and expertise in the field."

Bishop testified that during the time he worked at Fisherman's Wharf, Li was "[e]xtremely professional, polished, [had a] great personality, [was] bubbly, energetic, very organized, a great trainer," and "[l]iked by everyone."  When Bishop left Fisherman's Wharf, he therefore recommended Li as his replacement, but was told by Lee that there was "[a]bsolutely no way" they were "hiring that girl" as project director because she was "not strong enough" and "not good enough."

Lee made many derogatory and discriminatory remarks towards and about women.  He referred to women in general as "cunts" and "bitches," and said one woman employee was an "old grouchy cunt."  He said "I would do her," referring to women employees, and said one woman had "[n]ice tits for an old broad."  Lee commented that women had childcare issues, and made insensitive comments about women and minorities in sales management positions.  When one witness told Lee that he wanted to promote another female employee who was "the number one sales rep in the region" and "third in the company," Lee said, "you don't need women on [your] management team" because "they're unreliable.  They miss time.  They get pregnant."  Lee said it was "better for [women] to stay home," and that a woman "should be [a] housewife or

---

[2]Forte was demoted shortly after returning from medical leave.  Vice president of sales Ted Curtis once referred to Forte as "just a typical dumb cunt."

mother" and "take care of the kids."  When Lee walked into a company dinner with "the number one sales rep in the company," he referred to her by saying "it's so nice to have a blond[e] on my arm."  He was "very condescending" towards women and "never asked" them to do something, but would "tell them" what to do as if women "were his slave[s]."  Fiore also once said of a female employee who was on disability leave, "[g]et rid of that cunt."  One witness observed that Lee "contributed to"—and Fiore "consented to"—an "environment" that was "hostile" against women.  Although Li did not hear these comments by Lee and Fiore, she found Lee to be "very intimidating" and "disrespectful."

Hicks was selected as the project director for Fisherman's Wharf upon Bishop's departure in 2003.  Li compared her numbers to Hicks' numbers and found that hers were higher, yet he was promoted.  When Hicks left, Joey Arcaro became project director.  Fiore stated that Arcaro was selected after "a formal hiring process" because he "really fit what we needed."  Li, who had informed Fiore of her interest in all future project director positions was not interviewed for the position.  Fisherman's Wharf continued to perform poorly under Arcaro's leadership, and on April 13, 2004, Bill Brown, Regional Director of Sales, gave the management team a "Final Written Warning" and placed them on a "Performance Improvement Plan."  The warning stated that failure to meet certain requirements "may result in further disciplinary action up to and including termination."  Although Li and the other Fisherman's Wharf managers did not meet the requirements, Trendwest did not discipline them further.

In June 2004, Li applied for a project director position in the Walnut Creek office.  She was interviewed by Lee, who told her that "maybe [Walnut Creek] wasn't a good fit for [her]" and suggested that she "take the [smaller] Novato store as it became available."  Li was thereafter also interviewed by Michael Feorene, a national trainer for Trendwest, who asked her only "standardized questions" for fifteen minutes, or no more than a half hour.  Li did not get either the Walnut Creek or Novato project director position and experienced frustration and disappointment.  Feorene testified he did not recommend Li for the job because he believed Li did not have the ability to develop employees to be successful, did not have the ability to assess performance, and did not have the leadership

6

qualities required to make those she supervises feel good about reporting to her. The Walnut Creek project director position was given to Hicks, who had been working as the interim project director in Walnut Creek. Fiore testified that Li was not selected for the Walnut Creek project director position because there "was a consensus opinion" that she was not ready to run a store. Fiore testified he did not recall seeing any written notes to that effect, stating he kept written notes about such things only "most of the time."

In late 2004, Trendwest announced it was constructing a second San Francisco office in Nob Hill. Li informed Arcaro that she was interested in being considered for the sales manager position in Nob Hill. Trendwest selected Hicks for the position. Trendwest created a new director of sales position for the two San Francisco stores and placed Bijan Shayesteh in that position. Steven Wilcox, a sales manager for the successful Roseville store, replaced Arcaro as the project director for Fisherman's Wharf. Wilcox, like Li, had made president's club once. He testified that Li's "performance was good," she was a "good closer," "salesperson," and "manager." Wilcox "felt that [Li] enthusiastically participated in the changes that [Trendwest] were seeking to implement" at Fisherman's Wharf. He could not identify "any weaknesses" for the time period he worked with her there. When Wilcox returned to Roseville several months later, Shayesteh replaced Wilcox as the project director for Fisherman's Wharf.

According to Li, all of the male project directors who came and went from Fisherman's Wharf did "the same exact things"; none of them did anything to turn the store around. Li was upset she was not given the chance to lead the office and implement her ideas, and it was "frustrating" for her to see the men who were unsuccessful at Fisherman's Wharf being laterally transferred to other locations. Bishop, for example, who Fiore described as a "real quality candidate" with "extensive experience running [Trendwest] stores," "struggled" in San Francisco. Despite this, Lee transferred Bishop to Novato so that Bishop "could keep his project director title and bonus," and because Lee was "concerned that if . . . Bishop stayed at [Fisherman's Wharf], he would be demoted because of the store's poor performance." Arcaro was laterally transferred to a project director position in Angels Camp after leaving Fisherman's Wharf. With Lee's

7

support, Wilcox was transferred to a regional director of sales position after leaving Fisherman's Wharf.

Li also did not feel respected as a woman. Lee, for example, would come to Fisherman's Wharf and talk to the male project director, and even to male sales representatives, more than he would talk to Li, even though she was the sales manager. Li was also repeatedly excluded from management meetings. Betty McCormick, who worked at Fisherman's Wharf, testified that Lee was "very condescending" towards women, and "demanding" and "very demeaning" to Li in particular. Lee "always insulted [Li] by how he treated her" and was "very disrespectful" of Li. In January 2005, Lee also reprimanded Li baselessly, calling her into the office and telling her in a threatening tone that she had violated the law and had misrepresented facts to a customer. Lee threatened to terminate Li if it happened again. This incident was "highly upsetting" to Li, who wrote to Trendwest's company broker Bill Dougherty complaining about Lee's baseless reprimand.

Li was "becoming very discouraged" at Trendwest. She felt like the "weight of the world in the office was on [her] shoulders because of the constant turnover" in the project directors. She began to feel a tremendous amount of stress trying to hold Fisherman's Wharf together. She was having trouble breathing and having heart palpitations, and she was having difficulty concentrating. Two of her friends suddenly passed away in late 2004. In February or March 2005, Li broke up with her boyfriend, only to learn she was pregnant with his child. Within weeks, she miscarried. After her doctor recommended that she take some time off, Li went on medical leave in March 2005 for depression and anxiety. While on medical leave, Li saw a psychiatrist who prescribed antidepressant medication and Ativan to relieve anxiety.

On or about June 1, 2005, Li returned to her sales manager position at Fisherman's Wharf. Shortly thereafter, Alfonso Alfaro became project director at Fisherman's Wharf. It was "very hard" for Li to see Alfaro become project director because she had worked with him at a prior company where he had a low level position called the "premium clerk," whose duty it was to pass out gifts to clients. Li felt she had "better

8

qualifications" than Alfaro, yet was never consulted about the project director position before it was given to him.

On July 16, 2005, Alfaro and sales manager Jeff Peterson "pulled [Li] into the office" and told her she was being removed from her sales manager position. Although Alfaro and Peterson told Li that she could go to Walnut Creek or San Jose as an assistant manager, Li felt that the offer of these lower positions was "demeaning" and "really a slap in the face." She knew that if she took either of these positions, she was eventually going to be terminated anyway. Fiore testified that the fact that Li was the sales manager at Fisherman's Wharf, which was one of the worst performing stores in the company, "was probably the most important factor" in his assessment of Li's skill set. He felt Li "needed to take some responsibility for the performance of the store at a minimum." According to Michael Power, who worked with Li at Fisherman's Wharf, Peterson later said of Li that he "had to get rid of the bitch" and that he had a "great group of guys [who] were going to be running the office."

On July 18, 2005, Li emailed Fiore, Peterson and Roger Craig, the head of human resources, that she was "being fired from [her] current position of sales manager for retaliation for the medical leave [she] took." She complained that although Trendwest stated they were demoting her because of her numbers, "other project directors who have gone through [Fisherman's Wharf] have had worse numbers," yet were "laterally moved to other project director positions and in more successful stores." Li cited Level, Bishop, and Arcaro as examples and asked if this was because they were men. Li also pointed out that Forte had been demoted to a sales manager position in San Jose after returning from a six-month medical leave. Li pointed out that she "consistently [had] the best numbers [at Fisherman's Wharf over] any other manager despite all the challenges." She requested reconsideration and reinstatement of her sales manager position.

Later that day, Fiore responded to Li's email stating neither gender nor medical leave played a role in the decision. He asked Li, "let us know by the end of the week" "whether you will assume a TO [takeover role, i.e., management] role in another store," "so we can make the necessary arrangements." Craig did not feel the need to investigate

9

whether the medical leave had any impact on Trendwest's decision because he was satisfied that she had been removed from her position because Fisherman's Wharf was not performing well.

Li, who was struggling financially for having been in a failing office for two years, became "very depressed" and "broken." She had anxiety problems and felt she had no worth. She went out on disability leave on July 20, 2005, and her doctor authorized further leaves periodically, stating Li would not be able to return to work until April 2006. Effective January 20, 2006, Trendwest terminated Li's employment for failure to return to work. Li found a new job with Shell Vacations, where she did "very well" and was promoted to manager within six weeks of starting her employment.

On September 16, 2005, Li filed a complaint with the Department of Fair Employment and Housing (DFEH). On September 22, 2005, she filed a complaint along with nine other former Trendwest employees. Li and the other plaintiffs filed a first and second amended complaint, and a third amended complaint, which is the operative complaint. Li alleged the following eight causes of action against Trendwest: (1) discrimination based on sex and disability; (2) harassment and failure to prevent harassment; (3) retaliation; (4) retaliation under CFRA; (5) wrongful termination, demotion and retaliation in violation of public policy; (6) intentional infliction of emotional distress; (7) breach of contract; and (8) breach of the implied covenant of good faith and fair dealing. Trendwest moved for summary judgment and the trial court granted summary adjudication of Li's harassment claim. The matter proceeded to trial on Li's claims for gender discrimination, disability discrimination, CFRA retaliation, retaliation under the Fair Employment and Housing Act (FEHA), and IIED.

After a trial, the jury found in favor of Li on her IIED claim and rejected her other claims. In the special verdict forms, the jury found as to the gender discrimination claim that: (1) Li did not establish a continuing violation with respect to any failure to promote or transfer her before September 16, 2004; (2) Li's gender was a motivating reason for Trendwest's failure to promote or transfer her; (3) Li's gender was not a motivating reason for Trendwest demoting her; and (4) Trendwest's failure to promote or transfer, or

10

the demotion, was not a substantial factor in causing her harm. As to her disability discrimination claim, the jury found that Li did not have a mental disability that limited a major life activity. As to CFRA retaliation, the jury found Li's medical leave was not a motivating reason for Trendwest demoting her. As to her FEHA retaliation claim, the jury found Li complained about gender discrimination but that the complaint was not a motivating factor in Trendwest's failure to promote, transfer, or demote her. As to the IIED claim, the jury found: (1) Trendwest's conduct was outrageous; (2) Trendwest intended to cause Li emotional distress, or act with reckless disregard of the probability that she would suffer emotional distress; (3) Li suffered severe emotional distress; and (4) Trendwest's conduct was a substantial factor in causing Li's severe emotional distress. The jury further found there was no constructive discharge, i.e., that Trendwest did not intentionally create or knowingly permit working conditions that were so intolerable that a reasonable person in Li's position would have no choice but to resign.

The jury awarded Li $21,000 for past economic loss, $50,000 for past noneconomic loss, $25,000 for future noneconomic loss, and no damages for future economic loss, for a total of $96,000. The jury awarded Li $250,000 in punitive damages after finding they engaged in malicious and oppressive conduct. The trial court denied Li's application for attorney fees. Trendwest moved for judgment notwithstanding the verdict (JNOV) on the IIED claim. Li also moved for JNOV as to the other claims. The trial court denied both motions, and both parties appealed.

## DISCUSSION

### A. Li's Contentions

### 1. Inconsistent Verdict

Li contends the jury's verdict was inconsistent because: (1) it is "illogical and inconsistent" for jurors to find that gender was a motivating reason in the denial of a promotion or transfer, while also finding that the denial was not a substantial factor in causing her harm; and (2) the jury could not have awarded damages for her IIED claim while denying her damages on her gender discrimination claim because both claims were based on the same conduct. We reject the contention.

11

Where the jury makes "inconsistent determinations of fact based on the same evidence," courts will deem the verdict inconsistent, requiring reversal. (*Cavallaro v. Michelin Tire Corp.* (1979) 96 Cal.App.3d 95, 101.) For example, a Court of Appeal held that a verdict in an employment case was inconsistent where the jury found the defendant employer had "made no promise" of employment and "had not misrepresented the kind, character, or existence of work," while also finding the defendant had intentionally or recklessly misrepresented and concealed important facts. (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358.)

A special verdict is inconsistent—and a new trial is warranted—only if there is no possibility of reconciling its findings, which are "hopelessly ambiguous." (*Singh v. Southland Stone, U.S.A., Inc.*, *supra*, 186 Cal.App.4th at p. 357; *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092.) When possible, the court must interpret a verdict "so as to uphold it and give it the effect intended by the jury." (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 424.) Even if special verdicts appear inconsistent, "if any conclusions could be drawn which would explain the apparent conflict, the jury will be deemed to have drawn them." (*Ibid.*) The appellate court reviews a special verdict de novo to determine whether its findings are inconsistent. (*Zagami, Inc. v. James A. Crone, Inc.*, at p. 1092.)

We conclude as to Li's first argument that it was not necessarily "illogical and inconsistent" for jurors to find that gender was a motivating reason in the denial of a promotion or transfer, while also finding that the denial was not a substantial factor in causing her harm. Li asserts there is no way the jury could have reasonably determined she did not suffer economic damages because her earnings at Fisherman's Wharf[3] were much lower than the estimated $250,000 that her vocational rehabilitation expert testified

---

[3]Li's earnings records showed she had $112,663 in wages, tips, and other compensation in 2001 and $100,092 in 2002 as assistant sales manager in Burlingame. In 2003, she had $76,095 in wages, tips, and other compensation as co-sales manager and later the sole sales manager at Fisherman's Wharf. In 2004, she her wages, tips, and other compensation was $78,358.

she would have earned had she been promoted to project director. Her expert, however, testified that his estimate was based on what an "average project director would earn in a *reasonably good store*." (Italics added.) Li offered no evidence of what project directors in either of the two San Francisco offices made. Bishop testified that a project director in a "good" store could have earned $175,000 to $250,000, but acknowledged that Fisherman's Wharf was one of the worst stores in the region. Li admitted she would not have earned more had she been promoted to project director in Novato.

Li also points to the fact that Ayman Damlakhi was earning approximately $400,000 per year as project director in the Roseville office in 2004 and that sales managers earned only "half as much" as project directors. Roseville, however, was a very successful, high-performing store. In contrast, there was testimony by Hicks that he did not earn enough at Nob Hill and opted to return to Walnut Creek as a lower level sales representative with no managerial role. In light of the insufficient evidence presented of earnings for the positions to which Li applied and was denied, the jury could have reasonably determined that Li failed to prove that she suffered economic loss when she was denied the promotion or transfers. (*Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989 [" 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery' "].)

The jury could also have reasonably determined that the gender discrimination that occurred was not a "substantial factor" in causing the psychological harm Li suffered. As noted, in 2004 and 2005, Li was facing tremendous stress from "trying to hold the store together." She felt like the "weight of the world in the office was on [her] shoulders because of the constant turnover." Li also faced many personal troubles. Two of her friends suddenly passed away in late 2004, and she suffered a break up and a miscarriage in early 2005. In light of the many hardships Li faced at the same time she was denied promotions or transfers, a jury could have reasonably determined that the discriminatory conduct was not a "substantial factor" in causing the emotional harm Li suffered.

We also reject Li's argument that it was inconsistent for the jury to award damages under her IIED claim, while not awarding her damages under her gender discrimination

13

claim. In *Wysinger v. Autmobile Club of Southern Caifornia.*, *supra*, 157 Cal.App.4th at page 424, the jurors found the employer liable under FEHA for failing to engage in an interactive process to determine a reasonable accommodation for an employee's disability, yet did not find the employer liable for failing to provide a reasonable accommodation for that employee. The Court of Appeal rejected the defendant's argument that the verdicts were inconsistent, stating they "involve separate causes of action and proof of different facts." (*Ibid.*) Noting that courts must look for "any conclusions [that] could be drawn which would explain [an] apparent conflict," the Court of Appeal concluded the jury could have found that the employer did not fail to provide a reasonable accommodation precisely because the lack of an interactive process prevented the parties from ever identifying what accommodation was required. (*Id.* at pp. 424–425.)

Similarly, here, Li's gender discrimination and IIED claims are distinct.[4] Li asserts the two claims were based on the same discriminatory acts,[5] but because a two-year statute of limitations applies to IIED claims, whereas a one-year statute of limitations applied to the gender discrimination claim, the jury, when evaluating the IIED claim, was free to consider additional incidents of discrimination that occurred during the year preceding September 16, 2004. (Gov. Code § 12960, subd. (d); Code Civ. Proc., § 335.1; see *Pugliese v. Superior Court* (2007) 146 Cal.App.4th 1444, 1450.) In other words, the gender discrimination and IIED claims did not stem from the

---

[4]For her gender discrimination claim, Li had to prove: Trendwest failed to promote or transfer her, or demoted or constructively discharged her; her gender was a motivating reason for the failure to promote or transfer, or demotion or constructive discharge; she was harmed; and the failure to promote or transfer or the demotion or constructive discharge was a substantial factor in causing her harm. To establish IIED, Li had to prove: Trendwest's conduct was extreme and outrageous; Trendwest intended to cause Li emotional distress or acted with reckless disregard of the probability that she would suffer emotional distress; Li suffered severe emotional distress; and Trendwest's conduct was a substantial factor in causing Li's severe emotional distress.

[5]Li asserts that because Trendwest's attorney argued below that there was no "distinction in the proof" between the FEHA and IIED claims, Trendwest is bound by that argument on appeal. She cites no persuasive authority to support this position.

same discriminatory acts, and different findings on those claims did not necessarily render the verdict inconsistent or "hopelessly ambiguous." (*Singh v. Southland Stone, U.S.A., Inc.*, *supra*, 186 Cal.App.4th at p. 357; *Zagami, Inc. v. James A. Crone, Inc.*, *supra*, 160 Cal.App.4th at p. 1092.)

Moreover, there was evidence presented of Trendwest's harmful conduct that was not directly related to Trendwest's gender-discriminatory acts. For example, jurors heard testimony that Lee angrily and baselessly accused Li of making misrepresentations to a customer and threatened to fire her if it happened again. That reprimand, which was "highly upsetting" to Li, was not related to any failure to promote or transfer, but was relevant to her IIED claim. Li also presented testimony regarding Trendwest's attitude towards individuals who took medical leave, and the fear the company may have instilled in her as she prepared to go on medical leave in March 2005. The jury could have reasonably determined that the way in which Trendwest demoted Li, a dedicated long-time employee, only six weeks after her return from medical leave, while not retaliatory, was cruel and intentional conduct that supported Li's IIED claim. Because evidence other than gender discrimination was presented to support a finding in Li's favor on her IIED claim, the jury's verdict denying her damages under her gender discrimination claim while awarding her damages under her IIED claim was not necessarily inconsistent or "hopelessly ambiguous." (*Singh v. Southland Stone, U.S.A., Inc.*, *supra*, 186 Cal.App.4th at p. 357; *Zagami, Inc. v. James A. Crone, Inc., supra,* 160 Cal.App.4th at p. 1092.)

### *2. Inadequate Damages*

Li contends she is entitled to a new trial on the issue of damages because the jury's award on her IIED claim was inadequate and must have been the result of "a compromise on liability." We reject the contention.

"[T]he question as to the amount of damages is a question of fact. In the first instance, it is for the jury to fix the amount of damages, and, secondly, for the trial judge, on a motion for a new trial, to pass on the question of adequacy." (*Wood v. Alves Service Transp.* (1961) 191 Cal.App.2d 723, 733.) "Whether the contention is that the damages

fixed by the jury are too high or too low, the determination of that question rests largely in the discretion of the trial judge.  The appellate court has not seen or heard the witnesses, and has no power to pass upon their credibility." (*Kraut v. Cornell* (1959) 175 Cal.App.2d 528, 531–534.)

An improper compromise verdict occurs when jurors cannot agree on the issue of liability, but those who believe the defendant is liable agree to return an award providing inadequate damages in exchange for the votes of jurors who believe the defendant is not liable.  (*Hamasaki v. Flotho* (1952) 39 Cal.2d 602, 607.)  An indication that the verdict is the result of an improper compromise occurs when the jury provides for grossly inadequate damages.  (*Id*. at p. 606.)  For example, a verdict awarding the plaintiff $200 for the loss of an eye "was a conclusive indication that the jury had compromised the issues of liability and damages." (*Ibid*.)  A new trial on all issues is required when a verdict is reached through compromise.  (*Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 371.)

Li asserts the jury's award of $75,000 in past and future non-economic loss and $21,000 in economic loss was likely the result of a compromise because it is "unexplained by the evidence or argument of either party."  However, the jury could have reasonably believed that Trendwest's intentional infliction of emotional distress culminated in Li's medical leave, and that her damages amounted to wages she lost while out of work from March to June 2005.  Based on her 2004 wages, tips, and other compensation of $78,358, three months of wages would have been approximately $20,000.  We find no basis to conclude that the jury's award was "manifestly so inadequate as to suggest a compromise verdict." (*Wilson v. Werner* (1980) 108 Cal.App.3d 878.)

### 3. Evidentiary and Instructional Error

Li contends the trial court erred in its evidentiary and instructional rulings related to her retaliation claim under the CFRA.  Specifically, she asserts the court erred in: (1) excluding the testimony of a human resources expert; (2) denying an instruction that the jury could infer retaliation from Trendwest's failure to investigate Li's complaint; and

16

(3) giving Trendwest's instruction that it was not the function of the jury to determine whether Trendwest behaved unwisely or made good or bad business decisions. We reject the contention.

### a. Human Resources Expert

Li challenges the trial court's exclusion of the testimony of her human resources expert, Dr. Jay Finkelman, who would have testified that Trendwest's failure to investigate Li's complaint of medical leave retaliation was evidence of its retaliatory intent. We conclude there was no error.

The trial court has broad discretion in admitting expert testimony, and we review its decision for clear abuse of its discretion, looking to whether the court's ruling exceeds the bounds of reason in light of all of the circumstances of the case. (*Piscitelli v. Friedenberg*, *supra*, 87 Cal.App.4th at p. 972; *Burton v. Sanner* (2012) 207 Cal.App.4th 12, 18.)

Here, Finkelman offered a list of proposed opinions, one of which was that the failure to investigate Li's complaint about retaliation for taking medical leave "would be required minimally acceptable HR practice." The trial court stated the case did not involve whether Trendwest followed good human resources practices, and that it did not "see what the expertise is that he's offering." The court suggested that Finkleman's testimony represented "an effort to try to put your case into an expert's mouth . . . [H]e's giving closing argument, he's not giving evidence. . . ." The court excluded Finkelman's testimony but agreed to consider any offer of proof Li might submit.

A few days later, Li submitted an offer of proof identifying a number of purported human resources issues about which Finkelman would testify, including, "Did Roger Craig deviate from standards in failing to investigate Victoria Li's claim of discrimination when she was fired?" The court stated it continued to believe Finkelman's testimony was irrelevant to whether Trendwest discriminated against Li. The court excluded the evidence, stating it feared Finkelman's testimony "could severely prejudice the issue by raising things that are not issues and adding kind of a patina of expertise to something that is within the common sense of jurors."

17

We find no abuse of discretion in the trial court's decision. A trial court should exclude expert opinion when " 'the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289; see Evid. Code § 801.) Here, testimony that it is not good "HR practice" to fail to investigate a complaint would have been within the common sense of jurors, and was therefore unnecessary, as well as potentially prejudicial. It would not have assisted jurors in determining whether anyone at Trendwest had discriminatory or retaliatory animus towards Li.

### b. Jury Instructions

Li contends the trial court erred in refusing to give an instruction that the jury could infer retaliation from Trendwest's failure to investigate Li's complaint, and by instructing the jurors that it was not their function to determine whether Trendwest behaved unwisely or made good or bad business decisions.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) " 'The refusal of a proper instruction is prejudicial error only if " 'it seems probable' that the error 'prejudicially affected the verdict.' " . . . "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." ' " (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322, 1333.)

We conclude the trial court did not err in refusing to give Li's requested instruction that "[a] defendant's failure to investigate the employee's complaint of adverse action may be grounds for drawing an inference of retaliation." Li cites no case law to support her position that a company's failure to investigate a post-employment claim of retaliatory discharge would support an inference that the discharge decision itself was retaliatory. Further, " 'instructions should state rules of law in general terms and should not be calculated to amount to an argument to the jury in the guise of a

18

statement of law. Moreover, it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition.' " (*Red Mountain, LLC v. Fallbrook Public Utility Dist*. (2006) 143 Cal.App.4th 333, 359–360.) As with Finkelman's testimony, the proposed instruction was potentially prejudicial in that it could have improperly encouraged the jury to weigh some evidence more heavily than the rest. The trial court did not err in refusing to give the instruction.

We also reject Li's argument that the trial court erred in instructing the jury that: "The issue in this case [is] whether Trendwest behaved unlawfully; not whether it behaved unwisely or made business decisions with which you disagree. It is not the function of the jury to second-guess whether Trendwest made good or bad business decisions. It is to determine whether Trendwest acted unlawfully as explained in these instructions." The instruction was a correct statement of the law. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 358 [employers must be given wide latitude to make personnel decisions without the threat of a jury second-guessing their business judgments].) Li asserts the instruction was improperly "repetitive" because the last sentence repeated the first, and because the jury had already been instructed that Li had to prove that unlawful animus was a "motivating reason" for the conduct of which she complained. Although the instruction states twice that the jury's role is to determine whether Trendwest acted unlawfully, we do not believe this repetition unfairly emphasized one party's position to the prejudice of the other party. (See *Williams v. Carl Karcher Enterprises, Inc*. (1986) 182 Cal.App.3d 479, 487, overruled on other grounds by *Soule v. General Motors Corp*., *supra*, 8 Cal.4th at pp. 574, 580.) Further, even though there were other instructions that informed the jury of the elements of Li's claims, this instruction was not repetitive of those instructions because it properly instructed the jury that in a discrimination case, as long as an employer's reasons are nondiscriminatory, its "true reasons need not necessarily have been wise or correct." (*Guz v. Bechtel National, Inc*., *supra*, 24 Cal.4th at p. 358.)

19

### 4. Harassment Claim

Li contends the trial court erred in granting summary adjudication of her harassment claim where she offered evidence that she was "belittled, excluded, avoided, dismissed, and passed over for promotion repeatedly." We disagree.

We review a trial court's summary adjudication decision de novo. (*Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 334.) We determine independently whether the record supports the trial court's ruling that a claim fails as a matter of law, and are not bound by the trial court's stated reasons. (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 951.) To prove a harassment claim, Li must demonstrate that: (1) she was subject to unwelcome sexual harassment; (2) the harassment complained of was based on sex; and (3) the harassment complained of was so severe or pervasive as to alter the conditions of employment and create an abusive working environment. (*Meritor Sav. Bank, FSB v. Vinson* (1986) 477 U.S. 57, 68; *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 608 (*Fisher*) [adopting federal standard for determining hostile work environment under FEHA in sexual harassment case]; *Haberman v. Cengage Learning, Inc.* (2009) 180 Cal.App.4th 365, 378–379 [harassing conduct must be " ' "severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex" ' "].) To demonstrate that harassment is sufficiently pervasive, "the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature." (*Fisher*, *supra*, 214 Cal.App.3d at p. 610.)

Li relies primarily on *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, a disability discrimination and harassment case in which the plaintiff suffered extreme and degrading behavior at the hands of her employer based on her medical condition. Noting that the Supreme Court in that case held that "discrimination and harassment claims can overlap as an evidentiary matter," (*id*. at p. 709), Li asserts that because there was ample evidence that Trendwest denied her promotions and transfers due to gender discrimination, she should have been allowed to proceed on her harassment claim. The Supreme Court, however, explained that "[t]he critical inquiry when a court is deciding whether the

20

evidence is sufficient to uphold a verdict finding both discrimination and harassment is whether the evidence indicates violations of both FEHA prohibitions." (*Id*. at p. 709.) The *Roby* case therefore did not relieve a plaintiff of her obligation to establish all elements of a harassment claim. To do otherwise would ensure that every plaintiff with a viable discrimination claim necessarily has a viable claim for harassment, making harassment in essence a lesser included offense of discrimination.

Moreover, to establish a hostile work environment, an employee "who is not personally subjected to such [harassing] remarks or touchings must establish that she personally witnessed the harassing conduct and that it was in her immediate work environment." (*Fisher*, *supra*, 214 Cal.App.3d at p. 611.) Here, although Li testified that she found Lee to be "very intimidating" and "disrespectful," she acknowledged she was not present when Lee, Fiore, and other males in upper management made vulgar and discriminatory comments about women. The trial court properly granted summary adjudication of her harassment claim.

### 5. Attorney Fees

Li contends the trial court erred in denying her attorney fees because she was actually the prevailing party on her gender discrimination claim. We reject the contention.

In California, attorney fees are recoverable only if a statute so allows. (Code Civ. Proc., § 1021.) FEHA provides that a court may award fees and costs to the "prevailing party" in a FEHA action. (Gov. Code § 12965, subd. (b).) Li concedes the jury rejected all of her FEHA claims, but contends she nonetheless prevailed on her gender discrimination claim because jurors found in her favor when they answered "yes" to question two on the Special Verdict Form, which asked, "Was Victoria Li's gender a motivating reason for Trendwest failing to promote or transfer her?" As noted, however, Li failed to prove harm and causation, essential elements of a FEHA claim. (Gov. Code, § 12940, subd. (a).) Li therefore was simply not a prevailing party, and was not entitled to fees under FEHA.

21

Li relies on *McFadden v. Villa* (2001) 93 Cal.App.4th 235, 236, but the case actually undercuts her position. Like Li, who prevailed on her common law IIED claim but lost on her fee-shifting claims, the plaintiff in *McFadden* prevailed on a common law battery claim against a deputy sheriff, but lost on a 42 U.S.C. § 1983 claim alleging excessive force. (*Id.* at p. 236.) Although the plaintiff therefore lost on his fee-shifting claim, the trial court awarded him attorney fees on the ground that the common law claim was factually related to the section 1983 claim. The Court of Appeal reversed, concluding that common law battery and federal excessive force claims were not identical, as the claims were pleaded separately, jurors received separate instructions on each claim, the claims had different elements, and the special verdict form required the jury to decide the claims separately. (*Id.* at pp. 241–242.) As a result, the trial court had abused its discretion in awarding fees. (*Id.* at p. 242.) Here, too, Li's common law IIED and statutory gender discrimination claims were pleaded separately, the jury received separate instructions on each claim, the claims had different elements and different limitations periods, and the special verdict form required that the claims be separately decided. Thus, as in *McFadden*, an attorney fees award would have been unwarranted, an abuse of discretion, and reversible error.

At oral argument, Li's counsel cited *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203 (*Harris*) in support of Li's position that the trial court should have awarded her attorney fees under FEHA. In *Harris*, the Supreme Court held that a plaintiff who proves discrimination is nevertheless not entitled to damages where the employer proves it would have made the same decision without any discrimination. (*Id.* at p. 232.) The Court noted, however, that a plaintiff in such a case may still be entitled to other relief, such as declaratory or injunctive relief, e.g., "a judicial declaration of employer wrongdoing" or "injunctive relief . . . to stop discriminatory practices." (*Id.* at p. 234.) The Court then stated that a plaintiff who has proven discrimination may also be eligible for " 'reasonable attorney's fees and costs,' " which "fulfills the objectives of [FEHA]" by compensating the plaintiff and her counsel for bringing a meritorious discrimination claim. (*Ibid.*)

*Harris* does not support Li's position because Li did not obtain *any* form of relief—monetary, declaratory, or injunctive—as a result of her FEHA claim. FEHA's attorney fees provisions provide attorneys with "statutory assurance that, *if they obtain a favorable result for their client*, they will actually receive the reasonable attorney fees provided for by the Legislature and computed by the court." (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 583, italics added; see *Farrar v. Hobby* (1992) 506 U.S. 103, 111 [to qualify for attorney fees, a civil rights plaintiff "must obtain at least some relief on the merits" of the civil rights claim].) In *Morrison v. Vineyard Creek L.P.* (2011) 193 Cal.App.4th 1254, 1263–1266, for example, a plaintiff who "prevailed in the *lawsuit*, in the sense that she obtained some of the relief she sought" from her non-FEHA causes of action, was not entitled to FEHA attorney fees where she failed to obtain any relief— even declaratory or injunctive—as a result of her FEHA claims. We have found nothing to support the conclusion—and we do not read *Harris* to mean—that a plaintiff is eligible for FEHA attorney fees whenever a jury finds that discrimination occurred, even where the plaintiff has obtained no relief whatsoever from the FEHA claim.

### B. Trendwest's Contentions

### 1. IIED

### a. Substantial Evidence

Trendwest attacks the jury's IIED award on two grounds. First, Trendwest contends there was no substantial evidence to support a finding of extreme and outrageous conduct. We reject the contention.

In order to be actionable as a claim for IIED, a defendant's conduct must be extreme and outrageous. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050–1051; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 450, pp. 668–669.) The defendant must act with the intent to cause emotional distress or with reckless disregard of the likelihood of such an outcome. (*Hughes v. Pair*, at p. 1050.) Further, the conduct must be the actual and proximate cause of the plaintiff suffering severe emotional distress. (*Ibid*.) To be "outrageous," the conduct must go "beyond all bounds of decency; ordinary rude or insulting behavior is not enough . . . ." (5 Witkin, supra, § 451 at p. 669.)

23

A party "raising a claim of insufficiency of the evidence assumes a daunting burden." (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 678.) "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) Accordingly, when reviewing an appeal under the substantial evidence standard, an "appellate court 'accept[s] the evidence most favorable' " " 'as true and discard[s] the unfavorable evidence as not having sufficient veracity to be accepted by the trier of fact.' " (*Id.* at p. 595.) Under the substantial evidence standard of review, "the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874, italics omitted.) Thus, if substantial evidence supports the verdict, "it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Id.* at p. 874, italics omitted.) In sum, the substantial evidence standard of review requires this court to view the record in the light most favorable to Li and to resolve all evidentiary conflicts and indulge all reasonable inferences in support of the judgment. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614; *Le v. Pham* (2010) 180 Cal.App.4th 1201, 1205–1206.)

Here, ample evidence was presented that Lee was biased against women, and that Trendwest ratified his behavior. Lee referred to women by derogatory terms and treated them poorly. Fiore admitted he "reprimanded" Lee for "derogatory comments" less than two months after he hired him, and acknowledged Lee's "glaring weakness," yet defended Lee against employee complaints. By 2005, Lee had "received five written reprimands, two documented verbal reprimands," and "18 alert line complaints." A 2005 reprimand required Lee to "have another person in the room" when talking to "female employees." The reprimands were ineffective, and complaints and issues with Lee persisted, yet Trendwest never fired Lee. Fiore even defended Lee's comments when another employee complained, claiming Lee's comments were not "derogatory." When

human resources manager Michael Meic stated that Lee was "sexist," and recommended Lee's termination, Fiore did not terminate him, claiming Lee had "good judgment" regarding promotions and was "a good evaluator of talent."

By refusing to terminate Lee, Trendwest enabled him to engage in multiple acts that caused Li harm. During Li's interview for the Walnut Creek position, for example, Lee told her that the smaller Novato store was more appropriate for her. Lee said there was "[a]bsolutely no way" they were "hiring that girl" as project director for Fisherman's Wharf because she was "not strong enough" and "not good enough." Lee excluded Li from management meetings even though she was the sales manager for Fisherman's Wharf, and demeaned her by talking to the male sales representatives more than he did to Li. In January 2005, he falsely accused Li of making misrepresentations and threatened her angrily, "highly upsetting" Li. Li believed that Lee "didn't, 'respect me as a woman and . . . didn't respect my position and what my contributions were."

Moreover, there was ample evidence of Trendwest's disapproval of employees who took medical leave. Only six weeks after Li returned from medical leave, Alfaro and Peterson "pulled [Li] into the office" to tell her she was being removed from [her] sales manager position. Peterson later said of Li's demotion that he "had to get rid of the bitch" and "that he had a group of guys" that "were going to be running the office." Finally, Trendwest, despite its "zero tolerance" policy, failed to even investigate Li's complaints of discrimination. Trendwest claims that "demotions, failures to promote, and terminations . . . cannot constitute extreme and outrageous conduct." (Citing *Janken v. GM Hughes Electronics.* (1996) 46 Cal.App.4th 55, 80.) Here, however, there was much more than the mere denial of promotions. The jury, which found that the denial of promotions or transfers that occurred between September 16, 2004 and September 16, 2005, were motivated by gender discrimination, could have reasonably determined that Trendwest's repeated denial of promotions or transfers[6]—combined with its ratification

_____

[6]As noted, a two-year statute of limitations applies to IIED claims so the jury was free to consider the denials of promotions and transfers that occurred in the year preceding September 16, 2004.

25

of sexist conduct and speech, Lee's dismissive attitude towards Li, who was a star performer, and the removal from her position shortly after she returned from medical leave—constituted conduct sufficient to satisfy the extreme and outrageous element of the IIED claim.

### b. Workers' Compensation Exclusivity

Trendwest contends the IIED claim was barred by workers' compensation exclusivity. We reject the contention.

As the California Supreme Court has made clear, for the workers' compensation exclusivity doctrine to apply, the "risk of injury must be inherent in the workplace." (*Torres v. Parkhouse Tire Service, Inc*. (2001) 26 Cal.4th 995, 1008.) "Neither discrimination nor harassment is a normal incident of employment." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 288.) "The Legislature . . . did not intend that an employer be allowed to raise the exclusivity rule for the purpose of deflecting a claim of discriminatory practices. . . . [¶] Thus, a claim for emotional and psychological damage, arising out of employment, is not barred where the distress is engendered by an employer's illegal discriminatory practices." (*Accardi v. Superior Court* (1993) 17 Cal.App.4th 341, 352, disapproved on other grounds in *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 816; see *Murray v. Oceanside Unified School Dist.* (2000) 79 Cal.App.4th 1338, 1363 [Court of Appeal upheld an IIED claim for employer's discriminatory conduct where the FEHA claim was barred by the statute of limitations, because the IIED claim was "founded upon actions that are outside the normal part of the employment environment"], abrogated on other grounds by *Hart v. National Mortg. & Land Co*. (1987) 189 Cal.App.3d 1420; *Jones v. Los Angeles Community. College Dist.* (1988) 198 Cal.App.3d 794, 802, 805 [upholding the plaintiff's claim for emotional and psychological damages where the distress was allegedly caused by employer's illegal discriminatory practices].)

Here, the allegations surrounding Li's IIED claim stemmed in large part from the same facts constituting her discrimination and retaliation claims. She presented evidence to support her position that she was harmed by the repeated denial of promotions and

transfers, and that she was retaliated against for taking medical leave. Because allegations relating to unlawful discrimination, which are not risks of injury "inherent in the workplace," established Li's IIED claim, workers' compensation exclusivity did not apply.

### 3. Punitive Damages

Punitive damages may be awarded where "clear and convincing evidence" demonstrates that a defendant has acted with "oppression, fraud or malice." (Civ. Code § 3294, subd. (a).) "Malice" is conduct intended to cause injury or "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civ. Code § 3294, subd. (c)(1).) "Oppression" is "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Civ. Code § 3294, subd. (c)(2).)

Trendwest contends the jury improperly awarded punitive damages to Li. First, Trendwest argues, "the jury found that harm to Li flowed only from intentional infliction of emotional distress. . . . Because Li's IIED claim fails as a matter of law for the reasons discussed above, so too does the jury's punitive damages award." In light of our decision upholding the IIED verdict, we reject this argument.

Trendwest further argues that even if the IIED verdict stands, the punitive damages award fails because Li failed to prove by clear and convincing evidence that Fiore or Lee was a managing agent, that Trendwest committed or authorized the conduct that caused her harm, or that Trendwest or knew of the conduct and approved it. We disagree.

An employer is liable for punitive damages based upon acts of an employee where the employer "had advance knowledge of the unfitness of the employee and employed him . . . with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct . . . or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." (Civ. Code, § 3294, subd. (b).)

27

Managing agents are defined as "those corporate employees who exercise substantial independent authority and judgment in their corporate decision-making so that their decisions ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 566–567.) To demonstrate that an employee is a managing agent, a plaintiff seeking punitive damages has to show that the employee "exercised substantial discretionary authority over significant aspects of a corporation's business." (*Id*. at p. 577.) The scope of a corporate employee's discretion and authority is a question of fact for decision on a case-by-case basis. (*Ibid*.)

In *White v. Ultramar, Inc.*, *supra*, 21 Cal.4th at page 577, a supervisor was determined to be a managing agent where she "was responsible for managing eight stores and at least 65 employees," where the "store managers reported to her," and "most, if not all, of the responsibility for running these stores" was delegated to her. In *Wysinger v. Automobile Club of Southern California*, *supra*, 157 Cal.App.4th at page 429, the Court of Appeal held that a jury "could find" that an employee was a "managing agent" where the employer gave that employee "discretion to decide how to punish" employees and " 'fostered tolerance' " of the employee's unlawful conduct by " 'not repudiating.' "

Similarly, here, Lee managed 150 employees in the Northern California region. According to Fiore, Lee's position was very important to the "region's issues." " '[H]is actions and words influenced a lot of people.' " Fiore was a Regional Vice President of Administration with 600 employees reporting to him, and he had and "full P & L responsibility." Both of them were in charge of making significant personnel decisions such as the promotion, demotion, and transfers of high-level managers such as project directors. In addition, Fiore had the discretionary authority to keep Lee employed even after human resources determined Lee was a "sexist" and needed to be terminated. Moreover, both Lee and Fiore themselves engaged in gender discriminatory acts that caused Li harm by, among other things, tolerating and approving of a sexist work environment in which women were called derogatory names, and refusing to promote or transfer Li because of her gender, as the jury found. Thus, we conclude the jury could

reasonably find that Lee and/or Fiore were managing agents who engaged in—and ratified of—the harmful conduct that caused Li harm.

Finally, Trendwest argues that the punitive damages were improper because "[t]here is good reason to believe that the jury in this case awarded punitive damages in an effort to punish Trendwest," and not to redress harm incurred by Li. Trendwest points to the derogatory comments by Lee and Fiore, stating they were not directed at Li and should not have been considered by the jury in awarding punitive damages. The comments, however, were relevant to the issue of punitive damages because they showed a callous disregard by Trendwest's managing agents for the rights of Trendwest's female employees, including Li, and were closely tied to the harm that Li suffered. (See *Wysinger v. Automobile Club of Southern California*, *supra*, 157 Cal.App.4th at page 428 [the Court of Appeal cited in support of the punitive damages award a comment to another employee that reflected the employer's unlawful animus that was related to the plaintiff's retaliation cause of action]; *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1161 [evidence of the employer's failure to investigate and remedy the harassment of other employees is relevant and admissible on the employer's "liability for punitive damages"].) We find no basis to reverse the jury's award of punitive damages.

## DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

_____
McGuiness, P.J.

We concur:

_____
Pollak, J.

_____
Jenkins, J.